IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-40573
_____


KENNETH GENTRY,

Petitioner-Appellant,

versus

GARY L. JOHNSON, Director,
Texas Department of Criminal
Justice, Institutional Division,

Respondent-Appellee.

_____

Appeal from the United States District Court for the
Eastern District of Texas
(4:93-CV-153)
_____

August 12, 1996
Before GARWOOD, WIENER and EMILIO M. GARZA, Circuit Judges.[*]

GARWOOD, Circuit Judge:

Petitioner-appellant Kenneth Gentry (Gentry) appeals the district court's denial of his habeas petition challenging his Texas conviction and death sentence for the capital murder of Jimmy Don Hamm (Hamm). We affirm.

**Facts and Proceedings Below**

I.  Pre-Trial Proceedings

---

[*]

Pursuant to Local Rule 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

On September 16, 1983, Gentry was arrested in Minnesota for the September 10, 1983, murder of Hamm in Denton County, Texas. On September 17, 1983, Denton County, Texas Sheriff's Detective Alton Davis (Davis) first met Gentry in Minnesota after his arrest. At that time, Davis advised Gentry of his rights under *Miranda v. Arizona*, 86 S.Ct. 1602 (1966), including the right to remain silent and the right to have a lawyer present prior to and during questioning. Gentry waived extradition and was returned to Denton County, Texas; he was arraigned in Texas on the same day. Gentry was again advised of his *Miranda* rights by the judge during the arraignment. Gentry requested counsel during the arraignment, and Gary Patton (Patton) was appointed to represent him.

On October 12, 1983, Gentry's mother, Betty Inez Gentry (Mrs. Gentry), delivered a handgun to Gentry in jail. Mrs. Gentry was arrested, charged with introduction of a deadly weapon into the jail, and was placed in jail. Mrs. Gentry was held in a cell behind her son for approximately one month; he could hear everything she said in the cell. After about a week in jail, Mrs. Gentry began crying and begging Gentry to help her. According to Gentry, his mother has physical health ailments, including emphysema. Mrs. Gentry would cry and call out to Gentry most often when the jail was sprayed for insects, apparently believing that her jailers were trying to kill her. "[R]ight before" October 24, 1983, Gentry requested to be moved, but the police officers

responded that there was no other place to put him.

On October 23, 1983, Gentry asked Officer Baker if his mother would be released (or put on probation) if he made a confession. Officer Baker told Gentry "they probably would" make such a deal but that he would have to speak to Davis. The next day, Officers Baker and Wilson informed Davis that Gentry wanted to talk to him. Davis knew that Gentry was represented by counsel and had made no attempt to question him at any time since his September 17, 1983, arraignment. After learning that Gentry wanted to discuss the offense, Davis met with him and again informed him of his *Miranda* rights, including his right to remain silent and the right to have a lawyer present. Gentry confessed to Davis that he had murdered Hamm, but when he was asked if he wanted to make a videotaped confession, Gentry asked if it would help get his mother out of jail. Davis said that he could not make any deals and that Gentry would have to speak to the district attorney. Gentry never asked to speak with his attorney or to have him present or notified.

In Davis's presence, Gentry met with Assistant District Attorneys Alan Levy (Levy) and Lee Gabriel at their office. When Gentry asked if he could make a deal for his mother to be released in return for his videotaped confession, he was informed that the district attorney's office would not make any deals with him. Levy stated that whether Gentry gave a statement or not would have "no impact whatsoever on [his] prosecution of the case." After Davis

3

and Gentry left the district attorney's office, Gentry told Davis there was no reason for him to make a videotaped statement if his mother would not be released. According to Gentry, Davis suggested that if he made a videotaped confession, then Levy might make a deal to let his mother out of jail. Davis did not recall the specifics of the conversation. Gentry admits that he was never promised any specific deal for making the videotaped confession. Instead, he understood that, after he made a videotaped confession, they would "discuss making a deal" about his mother. Gentry agreed to make a videotaped confession and was again advised of his *Miranda* rights before making the confession. He testified that he understood at the time he made the statement that he had the right to remain silent, that he had the right to have a lawyer present, and that he had the right to terminate the interview at any time. When the sound on the first videotape failed, Gentry gave his confession on videotape a second time.[1]

After the second videotaped confession was made, Patton was advised by the prosecuting attorney that Gentry had confessed and that the charges would be elevated to capital murder. Two or three days after Gentry made his confession on videotape, Patton visited Gentry in jail and advised him of the prosecution's offer: Gentry

---

[1]

In this videotaped confession, Gentry admitted to killing Hamm and inculpated himself in other crimes. He claimed to have shot Hamm three times (instead of two as the physical evidence at trial showed). Gentry also claimed that he killed Hamm in response to threats made by two unknown individuals.

could plead guilty to murder and receive a life sentence; if he refused, then he would be re-indicted for capital murder. Gentry refused the offer and was re-indicted for capital murder. At some point after Gentry was re-indicted, Richard Podgorski (Podgorski) was appointed to represent him as Patton's co-counsel.

II.   The State Murder-Robbery Trial

The guilt-innocence phase of Gentry's trial began on February 29, 1984. The State rested the following morning, after calling several witnesses and entering the videotaped confession into evidence. The Texas Court of Criminal Appeals set forth the facts of the offense as shown at trial:

> "The appellant, Kenneth Gentry, and the deceased, Jimmy Don Hamm, became acquainted when Gentry[2] gave Hamm, who was hitchhiking, a ride into the Denton area. At the time, Gentry was wanted by the authorities in connection with several prior offenses, including an escape from a Georgia prison. After a brief visit in Denton, Gentry and Hamm left Texas, along with Gentry's girlfriend and sister.[3] They travelled to Georgia, where the two men committed an armed robbery. The foursome then moved on to Florida, then back to Texas, to Oklahoma, and then came back to the Denton area, where Hamm's body was later discovered.
>    According to the testimony adduced at trial, approximately two days prior to the offense, Gentry posed the following hypothetical question to Harold Loftin [(Loftin)], his uncle:  'If you was [sic] going to

___

2

The name Gentry has been substituted here and subsequently for "appellant" or "the appellant" in the excerpted portion of the opinion, and we use the spelling "Hamm" instead of the Criminal Court of Appeals' spelling "Ham."

3

We note that it appears from the record that Gentry's girlfriend and sister first joined Gentry and Hamm in Georgia, not Texas.

dispose of somebody, how would you do it?'  Loftin obligingly replied, 'I would find the most wooded, most deserted area I could find and that's where I would do it . . . because I love the woods.'  Gentry's sister overheard the conversation between Gentry and his uncle, and testified to the effect that her brother was seeking a new identity at that time.  Linda Patterson [Patterson], Gentry's girlfriend, testified that Gentry told her he intended to assume the identity of [] Hamm and find work in another state.

On the date of the murder, September 10, 1983, Gentry and his travelling companions (sister [Violet Ann Hayes (Hayes)], girlfriend and Hamm) arrived at the trailer home of Gentry's friend, Charles Goodman [(Goodman)].  Also present were Gentry's two brothers, Calvin and Larry Gentry.  According to the testimony, at one point, when Hamm left the room for a few moments, Gentry announced: 'There goes my new I.D.'  A short time later, a police car was seen driving down the road adjoining Goodman's property.  Gentry's sister, aware that her brother was wanted by the Georgia authorities for his prison escape and for the robbery he committed with Hamm, ran to warn the two men.  Momentarily, Gentry and Hamm left in one vehicle, with Gentry's two brothers following in a truck.

According to the testimony admitted before the jury, during the time the offense was to have occurred, Calvin Gentry, Gentry's younger brother, testified that he and his brother Larry went to a local pool hall and 'shot pool for about two, three hours.'  While [Gentry's] brothers were at the pool hall, [he] took Hamm to a remote part of Lake Dallas, ostensibly to engage in target practicing with a pistol.  The evidence indicated that both Gentry and [] Hamm were intoxicated at the time.  Hamm finished firing the pistol and handed the gun to Gentry.  Gentry took the pistol and made as if he were preparing to shoot toward a drink can he had thrown into the lake.  Rather than shooting the target, Gentry abruptly swung around and shot Hamm once in the head and once in the chest area.  [] Patterson, Gentry's girlfriend, testified as to a conversation she had with Gentry later that evening: 'He [Gentry] asked me if I knew what brains looked like.  And I said 'No.'  It hadn't got quite dark yet.  He told me to look up, that is what brains look like, like clouds . . . . [Gentry] said him and [Hamm] were on the riverbank target practicing. [Hamm] had just got through with his turn, handed the gun to [Gentry], [Hamm] was doing something to the bullets and [Gentry] pretended  he was going to shoot

6

whatever they were shooting at.  He swung the gun around and shot [Hamm] twice in the chest.  And [Hamm] fell down and he shot him once through the head.'

Gentry and [the] state presented contradictory versions as to whether the wallet was on Hamm's person at the time of the murder or whether Gentry removed the wallet from the decedent's back pocket after the killing.  Gentry then dumped Hamm's body into the shallows of Lake Dallas.  It was recovered some four days later, after being spotted floating face down in the lake by a fisherman and his son.  The autopsy revealed that the decedent was shot twice:  once in the left chest area and once in the skull.  According to the evidence, either wound would have caused the death of the victim.

Following the murder, Gentry and his sister, and his girlfriend fled to Austin, Minnesota, where they were later arrested and returned to Denton County after waiving extradition.  Evidence obtained from [Patterson's] purse included Hamm's wallet and several items of identification bearing the name of [] Hamm.

In addition to the above testimony, in a videotaped statement, Gentry confessed to the murder of [] Hamm by shooting him with a pistol.  According to Gentry, the victim's wallet was left on the dashboard of the car while the two were target practicing." *Gentry v. State*, 770 S.W.2d 780, 783-84 (Tex. Cr. App. 1988), *cert. denied*, 109 S.Ct. 2458 (1989).

Defense counsel's cross-examination of the State's witnesses was brief.  They asked no questions at all of seven State witnesses.  Defense counsel made no opening statement to the jury and called no new witnesses, choosing instead to recall three of the State's witnesses.  Gentry's case-in-chief was also quite brief.  The case was submitted to the jury on the afternoon of March 1—the same day the prosecution rested its case-in-chief.  On March 2, 1984, the jury returned a guilty verdict against Gentry for the robbery-murder of Hamm.

After the jury returned its verdict in the guilt-innocent

7

phase—and possibly as late as after the verdict in the punishment phase—a psychiatrist hired by defense counsel evaluated Gentry. The psychiatrist diagnosed Gentry with sociopathy and told trial counsel that they would not want him to testify for their client. The punishment phase of the trial began in the afternoon of March 2. The State called twelve witnesses and rested. Defense counsel again made no opening statement and did not call any witnesses. The jury returned a verdict later that afternoon, answering two special issues: that Gentry acted deliberately and that there was probability of future dangerousness. The trial court sentenced Gentry to death on March 5, 1984.

III. Appeal and Post-Conviction Proceedings

Gentry was appointed counsel for his appeal (Podgorski and Thomas Whitlock). After Gentry's appeal, the Texas Court of Criminal Appeals affirmed the conviction and sentence on November 23, 1988. *Gentry v. State*, 770 S.W.2d 780 (Tex. Crim. App. 1988). Gentry's conviction became final when the United States Supreme Court denied certiorari on June 5, 1989. *Gentry v. Texas*, 109 S.Ct. 2458 (1989). Gentry's execution was first set for August 1, 1989, but it was stayed to allow Gentry to file a post-conviction application for a state writ of habeas corpus. Gentry, through new counsel, filed a state habeas application on January 22, 1990. His execution date was modified to March 20, 1990. The state trial court, the same judge who had presided at Gentry's trial, resolved

8

factual issues underlying petitioner's claims on the basis of attorney affidavits supplied by petitioner's two trial counsel, and entered findings and conclusions recommending denial of habeas relief on March 9, 1990. The Texas Court of Criminal Appeals later adopted these findings and denied habeas relief in an unpublished opinion issued April 1, 1992. The United States Supreme Court denied certiorari review of the denial of state habeas relief on January 19, 1993.

Gentry, through the same counsel who represented him in the state habeas proceedings, filed the instant petition under 28 U.S.C. § 2254 on June 28, 1993. The State responded, incorporating a motion for summary judgment in its response on December 8, 1993. Gentry filed a motion for summary judgment on February 23, 1994. An evidentiary hearing was held on May 16, 1994. At the hearing, the district court heard testimony from Gentry's family members regarding his childhood and relationship with his family, and Gentry offered exhibits regarding his trial attorneys' fees. The district court ordered the hearing to be resumed on July 7, 1994. Gentry continued his efforts to obtain certain evidence through discovery. On June 15, 1994, the district court ordered the State to answer Gentry's interrogatories and to produce all available documents requested in Gentry's request for production. On June 27, the State provided some of the requested discovery, but it claimed that most of the documents requested were reposed with the Denton County District Attorney, who had provided all of the

9

documents in the county's possession.

At the July 7, 1994, evidentiary hearing, the district court heard testimony from one of Gentry's trial counsel (Patton), his sister Hayes, and L.D. Shipman (Shipman) of the Denton County District Attorney's Office. Shipman testified that while the section 2254 proceeding was pending he had provided Gentry's habeas counsel with every requested item in the county's possession, but that some of the pages from the physical evidence file were missing. The pages in the physical evidence file were hand-numbered and were no longer in order. After the July 7 evidentiary hearing, the district court ordered a final evidentiary hearing to be held on December 16, 1994. On November 22, 1994, the district court denied Gentry's motion for summary judgment, and it granted the State's motion for summary judgment on all claims except the claims of ineffective assistance of counsel and improper inducement of his confession. Thus, the only remaining issues of fact to be considered at the December 16, 1994, evidentiary hearing were related to the ineffectiveness of Gentry's trial counsel and improper inducement of his confession. At the December 16 hearing, the district court heard testimony from Gentry's other trial counsel (Podgorski), the psychiatrist retained by Gentry's trial counsel (Dr. Edwin Taboada (Taboada)), and prosecutor Levy.

The district court entered its final order denying all relief to Gentry on April 12, 1995, and it denied his motion for reconsideration on June 12, 1995. Gentry filed a notice of appeal

10

on June 29, 1995, and the district court granted a certificate of probable cause on August 17, 1995.

## Discussion[4]

I.   Sixth Amendment Right to Counsel

Gentry argues that the state trial court erred by allowing his videotaped confession to be admitted into evidence because it was obtained in violation of his Sixth Amendment right to counsel.[5]

---

[4] In its post-oral argument letter brief, the State relies on the habeas corpus provisions of the Antiterrorism and Effective Death Penalty Act of 1996. Because we affirm the denial of Gentry's petition on other grounds, we do not reach the issues raised by the State in its letter brief.

[5] Gentry also implies that the videotaped confession was involuntary under the Fifth Amendment because it was improperly induced by (1) improper promises that his confession would aid his mother's case, and (2) a false promise that giving a statement would not harm his case. These implied arguments are without merit.

Gentry suggests that he was improperly induced to give his confession by suggestions allegedly made by Levy and Davis that, if Gentry confessed, his mother would be given more lenient treatment. Gentry testified that he understood that prosecutor Levy and Detective Davis would "discuss making a deal" regarding his mother after he made a videotaped confession. He does not claim that any specific promises were made to him by any police officer or prosecutor. Prosecutor Levy denied suggesting that a deal might be made if Gentry confessed on videotape. Davis, who was present during the meeting between Gentry and Levy, testified that his impression from the conversation was that no deals would be made. The district court believed the State's version of the facts. The district court's credibility determination is not clearly erroneous. *See United States v. Leal*, 74 F.3d 600, 605 (5th Cir. 1996) (applying clearly erroneous standard to district court's credibility choices and findings of fact). Because Levy did not suggest that Gentry's mother might be released from jail if he confessed on videotape, Gentry was not induced to confess by such a suggestion by Levy. In contrast to Levy, Davis did not specifically deny suggesting that Gentry's mother might be treated more leniently if he confessed. Davis stated that he did not

11

Specifically, he argues that the Sixth Amendment mandates the presence and participation (or at least notification of) counsel in an accused's post-indictment decision to forego further assistance of counsel. The State responds that the only pertinent inquiry is whether, under a totality of the circumstances test, Gentry voluntarily waived his Sixth Amendment right to counsel.

We have previously held that "[a] defendant [who is represented by counsel] may waive his [Sixth Amendment] right to counsel without notice to counsel." *Self v. Collins*, 973 F.2d 1198, 1218 (5th Cir. 1992) (citation omitted), *cert. denied,* 113 S.Ct. 1613 (1993); *see Mann v. Scott*, 41 F.3d 968, 976 n.7 (5th Cir. 1994) (recognizing and agreeing with holding in *Self*), *cert.*

recall making such a suggestion. Nevertheless, the fact that Levy specifically told Gentry that he would make no deals, along with the fact that Gentry knew that Davis had no authority to make a deal with him, supports the district court's implicit finding that Gentry was not induced by any suggestion Davis may have made. The district court's implicit finding is not clearly erroneous.

Gentry also claims that he was improperly induced to provide the videotaped confession by Levy's statement that a confession would have no impact whatsoever on the prosecution of his case because this statement misled Gentry to believe that his confession would not lead to the elevation of the charge against him from murder to capital murder. As noted by the district court, Gentry "*has never testified that he operated under such a misapprehension.*" In addition, Levy testified that he:

> "told [Gentry] I would not make a deal with him under any circumstance. Matter of fact, I think part of the conversation was the defendant indicated that rather than go to prison he would rather get the death penalty. And I told him that I would be happy to accommodate him."

The district court credited Levy's testimony, and its credibility choice is not clearly erroneous. The context in which Levy's statement was made supports the district court's finding that such statement did not induce Gentry's videotaped confession.

12

*denied*, 115 S.Ct. 1977 (1995).  In *Mann*, we rejected an argument identical to Gentry's: that whether a defendant initiated any communication with police is irrelevant because the State had a duty under the Sixth Amendment to notify his counsel prior to engaging in interrogation and obtaining a confession from him. *Mann*, 41 F.3d at 976.  We note that, even if we were inclined and able to alter our previous rule, a habeas petitioner such as Gentry would not be entitled to have such a new rule applied to his case unless it were "dictated by precedent existing at the time [his] conviction became final."  *Id.* (quoting *Teague v. Lane*, 109 S.Ct. 1061 (1989)).  No such precedent exists.[6]

---

[6]

*Massiah*, *Maine*, and *Brewer,* relied on by Gentry, were each rendered prior to our decision in *Self*.  *See Maine v. Moulton*, 106 S.Ct. 477 (1985); *Brewer v. Williams*, 97 S.Ct. 1232 (1977); *Massiah v. United States*, 84 S.Ct. 1199 (1964).  Gentry also relies on *Michigan v. Jackson*, 106 S.Ct. 1404 (1986), but *Jackson* was considered by this Court in *Mann.*  *Mann*, 41 F.3d at 975.  Neither does *Holloway v. State*, 780 S.W.2d 787, 795 (Tex. Cr. App. 1989), support Gentry's position.  *Holloway*, a state court decision, would not dictate a new federal constitutional rule to this Court.  And *Holloway* was rendered more than four months after Gentry's conviction became final, meaning that it could not have dictated the rule within the appropriate time frame.  Finally, we acknowledge that *Holloway* has been interpreted to stand for the proposition that, once the Sixth Amendment right to counsel attaches, "the police may initiate interrogation only through notice to defense counsel, and a defendant's unilateral waiver of his Sixth Amendment right to counsel is invalid *under these circumstances*." *Upton v. State*, 853 S.W.2d 548, 553 (Tex. Cr. App. 1993) (en banc) (emphasis added).  But, because *Holloway* involved state-initiated questioning, it does not necessarily support petitioner's requested rule that *under any circumstances* a
defendant cannot unilaterally validly waive his Sixth Amendment right to counsel after such right has attached.  *See State v. Frye*,

13

In fact, two Supreme Court cases have suggested that petitioner's requested rule should be rejected. First, the Supreme Court stated in dicta in *Patterson v. Illinois*, 108 S.Ct. 2389, 2394 (1988)(citation omitted), that if the defendant had invoked his right to counsel, then the State would have been prohibited from questioning him further "unless the accused himself initiates further communication." Second, the Supreme Court described the prophylactic rule prohibiting the admission of statements obtained in violation of the Sixth Amendment right to counsel as applicable *when the State initiates the communication*. *Michigan v. Harvey*, 110 S.Ct. 1176, 1177 (1990) ("once a criminal defendant invokes his Sixth Amendment right to counsel, a subsequent waiver of that right⸺even if voluntary, knowing, and intelligent under traditional standards⸺is presumed invalid *if secured pursuant to police-initiated conversation*"(emphasis added)).[7] The extension of

---

897 S.W.2d 324, 327 (Tex. Cr. App. 1995) (applying *Holloway* to state-initiated telephone conversations*); Upton*, 853 S.W.2d at 553-54 ("[H]ere, it is undisputed that each statement resulted from police-initiated interrogation.); *Holloway*, 780 S.W.2d at 795 (finding Sixth Amendment violation occurred pursuant to police-initiated interrogation).

[7]

We reject Gentry's argument that the *Harvey* language is inapposite because *Harvey* allowed evidence admitted only for impeachment purposes. While the *Harvey* decision does address the admissibility of a confession for impeachment purposes, the distinction between evidence admitted for impeachment purposes and that admitted as substantive evidence has no bearing on the antecedent question whether the evidence is obtained in violation of the Sixth Amendment.

14

the prophylactic rule to exclude voluntary statements made in defendant-initiated conversations with the State is not supported by the precedent of this Circuit or the Supreme Court. Even if this Court were to create such a new rule, Gentry could not benefit from it because the rule did not exist prior to when his conviction became final. The district court did not err in refusing to grant the writ of habeas corpus on this ground. Consequently, the question is whether, under the totality of the circumstances test, Gentry voluntarily waived his Sixth Amendment right to counsel. For this purpose we accept the district court's findings of historical facts, as those findings are not clearly erroneous, see *Mann* at 975, and considering the totality of the circumstances, we conclude, as did the district court, that the waiver was voluntary.

There is sufficient evidence to support the district court's finding that Gentry initiated his statement with the police. Davis testified that Gentry informed officer Baker of his desire to speak with Davis about the offense. Davis also testified that when he met with Gentry he again informed him of his *Miranda* rights, including the right to remain silent and to have an attorney present. Gentry does not deny that he initiated the communications with Davis, nor does he claim to have ever requested the assistance, presence, or notification of counsel after he initiated the communication with Davis. His only argument that he did not validly waive his Sixth Amendment right to counsel—other than the

15

legal argument that he could not validly waive his right to counsel without notice to counsel——is that he did not initiate the communication *with Levy* because Davis suggested the meeting between Gentry and Levy.  His argument implies that a defendant's initiation of communications to one State actor does not allow other state actors to then participate in the communications.  We reject such a distinction.  *See Michigan v. Jackson*, 106 S.Ct. 1404, 1410 (1986) ("[T]he Sixth Amendment concerns the confrontation between the State and the individual.").  Because Gentry initiated the communication with the State, never indicated any desire whatsoever to speak to his attorney (or have him present or notified), and repeatedly disavowed his right to counsel, we hold that the district court properly found a voluntary and valid waiver of his Sixth Amendment right to counsel.

II.    *Brady* Complaints

Gentry argues that the State improperly denied him access to exculpatory material available to the State at trial, thus requiring reversal under *Brady v. Maryland*, 83 S.Ct. 1194 (1963). The Supreme Court held in *Brady* that the Due Process Clause is violated when material evidence favorable to the accused is withheld from the defense.  *Brady*, 83 S.Ct. at 1196-97.  To establish a violation of Due Process under *Brady*, a defendant must show that (1) the State withheld evidence (2) which was favorable to the defense and (3) was material either to guilt or punishment.

16

*Id.; Westley v. Johnson*, 83 F.3d 714, 725 (5th Cir. 1996) (citation omitted). Evidence is material under *Brady* if there is a reasonable probability that disclosure would have resulted in a different outcome. *Kyles v. Whitley*, 115 S.Ct. 1555, 1565 (1995); *United States v. Bagley*, 105 S.Ct. 3375, 3383 (1985). A reasonable probability is probability sufficient to undermine confidence in the outcome. *Kyles*, 115 S.Ct. at 1566; *Bagley*, 105 S.Ct. at 3383. Thus, Gentry must show the suppression of "favorable evidence [that] could reasonably be taken to put the whole case in such a different light as to undermine confidence" in the outcome. *Kyles*, 115 S.Ct. at 1566. He fails to meet this burden.

A. The missing pages

Gentry's trial counsel specifically requested production of certain pages from the State's physical evidence file prior to *voir dire*. The State refused to produce some of the specified pages. The trial court denied Gentry's request to order the State to produce the pages, and it declined to review the pages in dispute. The trial court did, however, specifically order the State not to destroy or dispose of the disputed pages in order to preserve them for appeal. The State is now unable to locate forty-two of the disputed pages. Gentry argues that the forty-two missing pages from the State's physical evidence file should be deemed to be exculpatory under the adverse inference rule.

The Supreme Court has expressed its unwillingness to impose an

17

absolute constitutional duty on police to retain and preserve all material that might conceivably be significant evidence. *Arizona v. Youngblood*, 109 S.Ct. 333, 337 (1988). Although generally courts allow an adverse inference to be drawn from the destruction of records, the destruction must have been committed in bad faith. *See Vick v. Texas Employment Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975). Mere negligence is not enough to trigger the inference. *Id.* A similar adverse inference rule, grounded in the Due Process Clause, may be applied against prosecutors in the criminal context, and it, too, is only applied if the criminal defendant can prove bad faith. *See Youngblood*, 109 S.Ct. at 337.

Gentry suggests that bad faith should be inferred in the instant case because the State failed to preserve evidence pursuant to a court order. The State's failure to preserve evidence which it has been ordered to retain might, in some cases, be one indicia of possible bad faith, but all of the surrounding circumstances must be considered in determining bad faith. *See, e.g.*, *Woodson v. Surgitek, Inc.*, 57 F.3d 1406, 1418 (5th Cir. 1995) (considering facts surrounding party's refusal to comply with court orders to find bad faith). The *Brady* claim was not raised in state court (for good reason), and the district court made no express finding regarding bad faith. Gentry points to two pieces of "evidence" of the State's bad faith—other than the State's failure to preserve the missing pages pursuant to court order. First, Gentry accuses

18

Levy of lying about having an open file policy during trial. Second, he accuses the State of suppressing from his counsel "each and every document in its files that reflected [the state] investigators' suspicion" of Loftin. Neither claim is supported by the record.[8]  On the other hand, Shipman's undisputed testimony that the pages in the physical evidence file were all hand-numbered and were out of order suggests negligence, not bad faith.  We find that Gentry fails to carry his burden of proving bad faith.  *See Youngblood*, 109 S.Ct. at 337.  While the court's order certainly obligated the State to retain the now-missing evidence, and while

---

[8]

Levy testified that he had a general open files policy at the time of Gentry's trial, but that he could not guarantee what Gentry's trial counsel did or did not see.  In contrast, Podgorski testified that he had never seen certain specific documents.  The district court credited Podgorski's more specific memory but did not find that Levy had lied about the policy.  We likewise do not view the somewhat conflicting testimony as evidence that Levy lied about the policy.  Gentry points to no other "evidence" of Levy's alleged deceit, and we find none.

Nor does the record support Gentry's assertion that the State intentionally suppressed information implicating Loftin.  Gentry cites to Loftin's affidavit to support this assertion.  Loftin's affidavit is consistent with his testimony.  Of all of the other evidence which was withheld from Gentry's trial counsel, only Hayes's statement implicates Loftin, and it does so only to the extent that it repeats the assertion that Loftin told Gentry that the woods would be a good place to kill someone.  Loftin's suggestion of the woods as a killing place was before the jury at trial through Loftin's own testimony.  The other suppressed evidence includes a report of Loftin's polygraph test, showing that he truthfully answered questions that he was not involved in the murder of Hamm, and taped interviews of Calvin Gentry, Larry Gentry, and Patterson.  None of this evidence implicates Loftin.  Thus, we find no record support of an intent to withhold evidence implicating Loftin.

19

we do not condone the State's negligent failure to do so, we reject Gentry's invitation to extend the adverse inference rule to cases in which bad faith has not actually been proven.

B.    Specific evidence

Gentry next points to two specific, allegedly exculpatory pieces of evidence which were withheld from him at trial as *Brady* violations.  This evidence, according to Gentry, was material to punishment because it would have allowed him to raise doubt about robbery as the motive for the murder and to raise the possibility of mitigating circumstances.

First, Gentry complains that statements attributed to himself in the affidavit of David Travis (Travis) were not made available to him.  Travis was an inmate in the Denton County Jail, along with Gentry, in September and early October 1983.  Travis testified for the State during the punishment phase of Gentry's trial about conversations he had with Gentry in jail regarding Gentry's plan to escape and kill his brothers and father for reporting him to the police.  Travis made a written statement to the State on October 4, 1983.  The State did not provide this statement to Gentry.  Gentry argues that it was a violation of *Brady* to withhold Travis's statement because portions of the statement repeating three of Gentry's own statements are exculpatory.    We reject this

contention.   Even if the statement is exculpatory,[9] it is not

---

[9]

Gentry does not claim that he could have impeached Travis with any part of his statement.  Instead he points to three particular statements that Gentry himself made to Travis, and that Travis repeated in his statement to the police, as exculpatory.  Gentry told Travis that: (1) Hamm left his billfold on the dashboard during the murder; (2) Loftin came up with the idea of Gentry killing Hamm for his identification and that Loftin suggested that he kill Hamm soon; and (3)  Gentry shot Hamm three times, instead of two as the autopsy report showed.  We doubt that the first two of these statements are exculpatory at all.

Gentry's statement that he was in possession of his brother's identification and that Hamm left his billfold on the dashboard does not support an inference that he had no intent to rob Hamm when viewed in context of the entire statement.  The relevant paragraph of Travis's undisclosed statement follows:
> "Gentry said that he was using his brother's identification for work, but the police found out that he was living in a trailer over in Krum, so it was time for him to get out of town.  He and [Hamm] left in Gentry's car and went to Oklahoma, and spent a day and a night there.  Then they came back to Gentry's uncle's place.  He said the uncle's name is Harold.  The uncle came up with the idea of Gentry killing [Hamm] and taking his identification to use.  Harold said to Gentry, 'if you're going to do it, now's the best time.'  He said that he could [switch] ID with [Hamm], and then Harold would go and identify the body as that of Gentry, and this would take the heat off Gentry.  Gentry said he was headed out to do it right then."

This statement cannot reasonably be viewed as providing an inference that Gentry lacked the intent to rob Hamm.  Similarly, no reasonable juror could view the claim that Loftin initiated the idea of killing Hamm *for his identification* as weakening the State's claim of a robbery motive.

We also find it doubtful that a reasonable juror could view Loftin's alleged initiation of the idea to kill Hamm as a mitigating circumstance.  Mitigating circumstances relevant to punishment within the meaning of the Eighth Amendment include evidence of "the defendant's background and character [which will support a] belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse."  *See California v. Brown*, 107 S.Ct. 837, 841 (1987) (O'Connor, J. concurring).

21

material.  Travis's statement is not material under *Brady* because all of the allegedly exculpatory material is merely repeated from Gentry himself.  Gentry obviously had knowledge of the alleged facts which he complains were withheld.  A defendant cannot establish a *Brady* claim based on withheld evidence if he already has knowledge of it.  *See, e.g., Williams v. Scott*, 35 F.3d 159, 163 (5th Cir. 1994), *cert. denied*, 115 S.Ct. 959 (1995) ("A *Brady* violation does not arise if the defendant, using reasonable diligence, could have obtained the information"); *Blackmon v. Scott*, 22 F.3d 560, 564-65 (5th Cir.), *cert. denied*, 115 S.Ct. 671 (1994) ("The state is not required to furnish a defendant with exculpatory evidence that is fully available to the defendant or that could be obtained through reasonable diligence"); *Duff-Smith v. Collins*, 973 F.2d 1175, 1181 (5th Cir. 1992), *cert. denied*, 113 S.Ct. 1958 (1993); *May v. Collins*, 904 F.2d 228, 231 (5th Cir. 1990), *cert. denied*, 111 S.Ct. 770 (1991).  "*Brady* claims involve 'the discovery, after trial of information which had been known to the prosecution but unknown to the defense.'  *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976)."  *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994). In *Lawrence*, we quoted with approval the following from *United States v. Jackson*, 6 F.3d 911, 918 (2d Cir. 1993):  "Evidence is

---

Loftin's alleged initiation of the murder does not fit our understanding of a mitigating circumstance.

22

not 'suppressed' if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." *Lawrence* at 257 (citation and internal quotation marks omitted).[10]

Gentry next argues that it was a violation of Due Process under *Brady* to withhold the statement of seven-year-old Jamie Loftin (Jamie), Harold Loftin's son. Jamie's statement places (Harold) Loftin at or near the scene of the crime on the day of the murder, in direct contrast to Loftin's own testimony. Assuming that Jamie could have been qualified as a witness[11] and would have

---

[10]

In addition, we also note that Gentry's claims that Hamm's billfold was on the dashboard and that he shot Hamm three times were before the jury in the form of Gentry's confession. Merely cumulative evidence is not material under *Brady*. Further, the allegedly exculpatory portions of Travis's statement are inadmissible hearsay that was not reasonably likely to lead to admissible evidence. *See Wood v. Bartholomew*, 116 S.Ct. 7, 10-11 (1995) (holding that inadmissible evidence is not material for *Brady* purposes); *Rumbaugh v. State*, 589 S.W.2d 414, 417 (Tex. Cr. App. 1979) (hearsay barred in Texas criminal proceedings); *Porter v. State*, 578 S.W.2d 742, 748 (Tex. Cr. App. 1979) (trial court must abide by rules of evidence, including hearsay, in punishment phase of capital murder trial).

[11]

Although Jamie's statement is inadmissible hearsay, it might still be *Brady* material if there were a reasonable probability that it could have changed the outcome (the death penalty) by leading to other admissible evidence. *See Wood*, 116 S.Ct. at 10-11. Unlike, Gentry's own statements to Travis, there is no indication that Gentry (or his counsel) knew that Loftin may have been at the crime scene on the day of the murder. Gentry points to no source other than Jamie that could have provided this information. Under *Wood*, this Court cannot assume that Loftin himself would have recanted and contradicted himself when faced with his son's statement. *See id.* at 10-11. It is possible, though not certain given Jamie's

23

testified that Loftin was present at or near the crime scene on the day of the murder, Gentry argues that this statement would have allowed the jury to infer that Loftin was actually involved in the murder. He further argues that implicating Loftin would have had a two-fold effect. First, it could have cast doubt on the motive of robbery. Second, it would have allowed the jury to consider that Gentry might not be a future danger if he were locked in prison away from the malignant influence of Loftin. Neither of these arguments withstands examination.

Jamie's statement provides evidence only that Loftin (and Jamie) were at or near the scene of the crime on the day of the murder. Considering the several witness statements that Gentry said he wanted to obtain Hamm's identification—in conjunction with the fact that Hamm's identification was in the possession of Gentry, Hayes, and Patterson when they were arrested—Jamie's statement does not undermine our confidence in the jury's determination that Gentry's motive for murdering Hamm was to obtain his identification. Gentry's argument that there is a reasonable probability that the jury would have answered the future violence issue negatively if they had evidence that Loftin was at the scene

confused musings during the cassette-taped interview of him, that Gentry may have been able to qualify Jamie as a witness to testify that he and his father were fishing at or near the crime scene on the day of the murder.

24

of the crime earlier in the day is meritless.[12]

C.    Cumulative effect of withheld evidence

Gentry argues that the district court erred by parsing the undisclosed statements into their component parts and concluding that each potentially exculpatory clause was not material.  While the Supreme Court has held that the cumulative effect of undisclosed evidence must be considered as a whole, it noted at the same time that the evaluation of the tendency and force of the evidence must be done item by item.  *Kyles*, 115 S.Ct. at 1567 n.10.  Thus, in sections II. A. & B. *supra*, we evaluated each item of undisclosed evidence separately.  Because Gentry is not entitled to the adverse inference rule, the missing documents provide him no support for a *Brady* error.  Travis's statement also lends no weight to the cumulative effect of the alleged *Brady* error.  Gentry's argument that the State violated the Due Process Clause by withholding material, favorable evidence from him must rely solely on Jamie's statement.  Our analysis of the cumulative effect of Jamie's statement is the same as our analysis of Jamie's statement alone.  Its admission would not have provided a reasonable probability of a different punishment.  In summary, viewing all of

---

[12]

Gentry's implied argument is that he would kill someone because his uncle told him to.  A jury is likely to find this itself to be evidence of future dangerousness.  There is certainly no reasonable probability that a reasonable juror would find Gentry less culpable than defendants who have no such "excuse."  *See Brown*, 107 S.Ct. at 841.

the suppressed evidence as a whole, the suppression does not undermine our confidence in the outcome of the punishment imposed. *See Bagley*, 105 S.Ct. at 3383. For these reasons, we find there was no *Brady* error.

III. Ineffective Assistance of Counsel

Gentry argues that the district court erred in denying his claim of ineffective assistance of trial counsel. To establish this claim, Gentry must satisfy the two-prong test enunciated in *Strickland v. Washington*, 104 S.Ct. 2052 (1984). First, Gentry must prove that trial counsel's performance fell below an objective standard of reasonableness as measured by prevailing professional norms. *Id.* at 2064. Second, he must also show that a reasonable probability exists that, but for counsel's unprofessional errors, the outcome would have been different. *Id*.

Relying on evidence presented in three evidentiary hearings before it, and without giving deference to the state habeas court findings, the district court held that Gentry's trial counsel's performance was deficient in, and only in, failing to cast doubt on the state's theory that the murder was committed during the course of a robbery. But, the district court held that Gentry failed to satisfy the second prong of the *Strickland* test to show prejudice from this deficiency.

On appeal, Gentry restricts his argument of ineffective

assistance to counsel's presentation of evidence at the sentencing stage of trial, arguing that the prejudice he suffered was in receiving the death penalty instead of incarceration. He points to three areas in which his trial counsel's performance was deficient and prejudiced him: (1) failing to develop the possible role of his uncle, Loftin, in the murder; (2) failing to develop, investigate, and call witnesses to testify as to mitigating circumstances in his past; and (3) failing to provide information to and call a medical expert to testify that he would not be a danger in the future.

A. Harold Loftin's role

Gentry argues that trial counsel's failure to produce evidence regarding "the implications of Harold Loftin's involvement in the offense" prejudiced him. He suggests two possible reasons this failure may have prejudiced him at the sentencing stage: the jury may reasonably have believed that Loftin (1) committed——or at least participated in——the murder, leaving Gentry a less culpable role, and/or (2) may have influenced Gentry to commit the crime, also making Gentry less culpable. The State responds that cross-examination of Loftin would not have resulted in Loftin's admission of a significant role in Hamm's murder, that Gentry fails to establish that any evidence of Loftin's alleged role could have been developed in any other manner, and that there is no reasonable probability that the jury would have viewed such evidence as lessening Gentry's culpability to the extent that he would not be

27

a future danger.

### 1. A direct role in the murder for Loftin

The record reflects that boot prints and shotgun shell casings were located near the scene of the murder. It also reflects that there was evidence that Loftin left work on the day of the murder, that he was wearing boots and carried a shotgun, that Loftin and his son went fishing at or near the crime scene on the day of the murder, that Loftin and his wife (Mrs. Loftin) were upset shortly after the time of the murder, that Loftin and his wife were concerned that Patterson might talk to the police, and that Mrs. Loftin destroyed photographs in Hamm's wallet after the murder and described her plan to claim Hamm's body as the body of Gentry.

As the district court noted, trial counsel's decision not to portray Loftin as a plausible suspect must be viewed in light of the situation counsel actually faced. *See Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990). "We must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' and that the 'challenged action might be considered sound trial strategy.'" *Belye v. Scott*, 67 F.2d 535, 538 (5th Cir. 1995) (quoting *Strickland*, 104 S.Ct. at 2065), *cert. denied*, 116 S.Ct. 1438 (1996). Gentry confessed that he killed Hamm alone. There is no evidence that Gentry ever repudiated his confession, to his lawyer or anyone else. Gentry also told Hayes, Mrs. Loftin, Patterson, and Goodman that he had

28

committed the murder with no mention of Loftin's presence, though he did indicate that Loftin suggested that the murder take place in a wooded area. The bullets which killed Hamm were .38 caliber, consistent with the weapon carried by Gentry——not shotgun shells. All of the evidence which might implicate Loftin in the murder is also consistent with Gentry's version of events. Neither Gentry nor any other witness has *ever* testified or furnished an affidavit saying *either* that Loftin was in fact present at (or participated in) the murder of Hamm *or* that Gentry (or anyone else) ever so informed any of Gentry's lawyers. Though there was some indication that Loftin may have lied about being at the scene of the crime on the day of the murder, the statement placing him at or near the scene did not implicate him in the murder. There is to this day no evidence that Loftin was present at, or directly participated in, the murder of Hamm. We agree with the district court that

> "an agonistic stance toward Loftin might well have injected damaging evidence against petitioner. The jury might have heard of [Mrs.] Loftin's destruction of Hamm's photographs from the billfold, and her plan to claim Hamm's body as the body of Gentry. Such evidence, not introduced at trial, would have bolstered the state's theory that the object of the murder was a new identity for petitioner. . . . [A] strategy to implicate Loftin would have fortified Gentry's motive for murder without shifting the responsibility for the murder convincingly to Loftin."

Gentry fails to carry his burden of showing either that counsel's performance was deficient in this respect or that any reasonable probability exists that Gentry would not have been given the death

penalty if his trial counsel had attempted to implicate Loftin directly in the murder.

### 2. Loftin's bad influence

Gentry argues that there is a reasonable probability that the jury would not have sentenced him to death if counsel had informed the jury of Loftin's adverse influence on him since he was a young teenager. Gentry points to no specific evidence of this bad influence on appeal. There is record evidence that Loftin was involved with Gentry's burning of a car that Gentry stole from a neighbor. There is also evidence that Loftin gave Gentry advice about where to kill Hamm and may have given him the idea to do it. We agree with the district court that

> "[i]n order to have further explored the extent of [Loftin's bad] influence, counsel would have been required to detail joint criminal enterprises conducted in the past by Loftin and Gentry. Any marginal benefit accruing from such a strategy would have to be weighed against the resulting damage . . . ."

Because any evidence of Loftin's bad influence would likely have also shown Gentry's own bad acts, Gentry has not shown either that counsel's performance was deficient in this respect or that there is any reasonable probability that, by counsel's addressing Loftin's bad influence on him, Gentry could have avoided the death penalty. Gentry fails to show either defective performance or prejudice from counsel's failure to implicate Loftin directly in the crime.

30

B.    Witnesses of childhood hardship

Gentry complains that trial counsel failed to provide effective assistance by failing to interview witnesses and present mitigating evidence of his childhood hardships, including alcoholic parents, childhood physical abuse, attempted suicide, several successful suicides in his family, psychiatric problems from adolescence, and periodic black-outs since infancy.  Ineffective assistance of counsel results from counsel's failure to interview witnesses only where a petitioner demonstrates that counsel would have found witnesses to support the defense theory, and that, if counsel had located and called the witnesses, they would have been willing to testify and their testimony would have been favorable. *See Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985).

The record shows that Gentry informed his counsel that he did not want any of his family members to testify.  A petitioner can show no defective performance under *Strickland* by his counsel's failure to interview witnesses whom the petitioner has opposed having testify.  *Amos v. Scott*, 61 F.3d 333, 348-49 (5th Cir.), *cert. denied*, 116 S.Ct. 557 (1995).[13]  Moreover, the district court found, on the basis of clearly adequate evidence, that Gentry's trial counsel "were aware of the evidence regarding petitioner's traumatized youth and his mental, emotional, and physical problems,

---

[13] Gentry fails to point to any nonfamily witnesses who could have testified about his childhood traumas.

31

but made an informed tactical choice not to present such evidence" based on "the state of Texas law at the time of petitioner's trial"—years before *Penry v. Lynaugh*, 109 S.Ct. 2934 (1989)—under which counsel concluded "'it would have only hurt him [Gentry].'" The Court of Criminal Appeals in its habeas review, and the district court below, both concluded that this was a reasonable tactical decision under the circumstances. We agree. *See, e.g., May v. Collins*, 904 F.2d 228, 232 (5th Cir. 1990), *cert. denied*, 111 S.Ct. 770 (1991); *id*. at 234 (concurring opinion of Judges Reavley and King). Counsel was not defective for failing to anticipate *Penry*.[14]

Gentry has not shown defective performance under *Strickland* in this respect.

C.    Medical expert

Gentry complains of trial counsel's failure to retain and present a mental health expert during the sentencing phase because such an expert could have presented the only scientific testimony available to the jury on the issue of future dangerousness. Defense counsel waited until the last day of trial—or perhaps the last day of the sentencing phase—to have a psychiatrist, Dr.

---

[14]

Moreover, we note that Gentry's failed attempted escape from the jail was in part for the purpose of killing his father, brother, and uncle, whom he believed had turned against him. His father had contacted the authorities, and several of his family members testified for the state. His mother was involved in the attempted escape and had smuggled a gun to him.

Taboada, evaluate Gentry.  Dr. Taboada met with Gentry one time, for no longer than an hour.  Counsel did not provide Dr. Taboada with Gentry's medical history, school history, psychiatric history, or family history.  Gentry argues that he was prejudiced by his counsel's failure to provide records and information to Dr. Taboada because, after having access to the relevant information, Dr. Taboada (1) was inclined to modify his original diagnosis to include possible depressive disorder with genetic basis, (2) explained that Gentry's family environment made it difficult to "break [] through the cell . . . of this anti-social environment," and (3) stated that there was "hope" for Gentry because his disorder is amenable to treatment.  The State responds that counsel's failure to provide records to Dr. Taboada is irrelevant because Dr. Taboada did not change his diagnosis of sociopathy or his opinion that Gentry would be a future danger even after he viewed all of the records.  We agree with the State.

Dr. Taboada clearly stated that he would *not* alter his diagnosis of sociopathy and that he still could not diagnose Gentry with depressive disorder.  He did state that, if he had been provided the information regarding Gentry's history, he would have suggested further evaluations of Gentry to determine if he might have some sort of genetic depressive disorder *in addition to* his sociopathy.  Dr. Taboada was still satisfied that Gentry is a sociopath, and he explained that a person can simultaneously have

33

sociopathy and a depressive disorder. Dr. Taboada opined that treatment of a person with both depressive order and sociopathy might make the person feel better, but he would not say, despite repeated questions, that the sociopathy could be treated. According to Dr. Taboada, it is difficult to treat sociopathy, and the treatment experience is largely negative.

Dr. Taboada also stated that, even after the information he had received from habeas counsel about Gentry, he was still satisfied with his original diagnosis that Gentry would probably commit violent acts in the future. In response to Gentry's attorney's question, Dr. Taboada equivocally stated that Gentry might be less likely to commit violent crimes while in prison with proper treatment and supervision, but he added that such a statement was speculation.

Dr. Taboada, described by Gentry's counsel as defense-oriented, continues to opine that Gentry will commit violent crimes in the future, with the caveat that if *Gentry is locked up in prison there is a chance to control his violent behavior*. But even this chance is mere speculation. Gentry has failed to show that there is a reasonable probability that, if counsel had given Dr. Taboada more information, his testimony would then have been helpful and would have provided a reasonable probability of a different punishment.

We reject Gentry's ineffective assistance of counsel claims.

34

## Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of Gentry's petition for habeas corpus relief.

AFFIRMED